**SO ORDERED**

**SIGNED this 19 day of October, 2026.**

**Pamela W. McAfee**
**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

**IN RE:**

**NOVA AT SUMMER MEADOW OWNER, LLC,**

**DEBTOR.**

**CASE NO.**
**25-03953-5-PWM**
**CHAPTER 11**

**ORDER VALUING PROPERTY, DENYING MOTION TO DISMISS, DENYING CONFIRMATION, AND TERMINATING AUTOMATIC STAY**

Consolidated evidentiary hearings on confirmation of the chapter 11 plan of reorganization filed by the debtor, Nova at Summer Meadow Owner, LLC (Nova), the motion for debtor in possession financing filed by Nova, the motion for relief from the automatic stay filed by the senior secured creditor USC 433 Hebron, LLC (USC), and USC's objection to Nova's disclosure statement, all of which depend upon a determination of value of Nova's real estate assets, and on USC's motion to dismiss were conducted on August 4 and August 18, 2026,[1] in Raleigh, North Carolina. This is a "single asset real estate" (SARE) case, as defined in 11 U.S.C. § 101(51B), and the primary issue before the court is whether the automatic stay must be terminated pursuant to § 362(d)(3) where the debtor's timely-filed plan is not confirmable. The court took all matters

[1] The transcript of the August 4, 2026 hearing is on the court's docket at D.E. 210, and references to testimony and argument made on that date are cited to the transcript at D.E. 210 at the relevant page. There is no transcript of the August 18, 2026 hearing, and references to testimony and argument made on that date are cited to the hearing audio, located on the court's docket at D.E. 213, with the appropriate time stamp noted in the citation.

under advisement at the conclusion of the hearings, and the matter is now ripe for determination. For the reasons that follow, the motion to dismiss is denied; but the court concludes that the plan does not meet the requirements for confirmation, and, therefore, the court has no discretion but to terminate the automatic stay. For purposes of preserving any and all issues going forward, however, the court includes its findings on valuation and other matters in the case.

**BACKGROUND AND PROCEDURAL HISTORY**

Nova filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 7, 2025. Nova is the owner of real property located at 433 Hebron Road, Durham, North Carolina, the site on which Nova has begun construction of three apartment buildings that are at various stages of completion. According to Nova, its petition for relief was necessitated by the failure of its senior secured lender, USC, to advance funds needed to complete construction. At the time of filing, construction was halted.

The case was filed on an accelerated basis and schedules were not filed until November 12, 2025, D.E. 25. Schedule A/B listed a multi-family construction project located at 555 Hebron Road, Durham, North Carolina with a value of $21,800,000 and "excess real property, Lot 2" with a value of $900,000. D.E. 25 at 4. The only personal property listed was the retainer paid to counsel in the amount of $21,738. *Id.* at 3. Nova listed two secured creditors on Schedule D: USC, with a claim in the amount of $9,976,876.26 secured by a first lien deed of trust, and UGro, LLC, with a claim in the amount of $2,500,000, secured by a second lien deed of trust. Nova did not designate itself as a SARE entity. *See* D.E. 1 at 2.

On November 26, 2025, USC filed a motion to dismiss the case, D.E. 31, contending that it was filed without proper corporate authority, and a motion to determine Nova's SARE status (the SARE Motion), D.E. 32. Both matters were scheduled for hearing on January 6, 2026. On

December 22, 2025, Nova filed a response in opposition to the SARE Motion, maintaining that because none of its residential dwellings were complete and habitable, its real estate asset was real property with fewer than four residential units and excluded from the definition of a SARE. D.E. 41.

On January 2, 2026, Nova filed an emergency motion to obtain postpetition financing (the DIP Motion), D.E. 46, seeking approval of an agreement to obtain postpetition financing from Southern Resolution Services, LLC (SRS) in the maximum principal amount of $4,100,000, payable at 13% with origination and disbursement fees of 3%, to complete construction. The DIP Motion requested that SRS be allowed a first lien on Nova's real estate pursuant to § 364(c)(3), contending that USC would still retain a substantial equity cushion to protect its interest. The court set the matter for hearing on expedited notice, also to be heard on January 6, 2026. On January 5, 2026, USC filed an opposition to the DIP Motion, D.E. 49, setting forth, among other things, concerns about Nova's operations and transparency, including its use of insider and affiliated entities to provide services to Nova; defending its decision not to extend additional funds for construction prepetition;[2] and questioning Nova's assertion of equity in the property. The same day, Nova filed a response in opposition to the motion to dismiss, D.E. 53. Nova also filed a motion to extend time to file its chapter 11 plan on January 5, 2026, D.E. 51. At the hearing on January 6, 2026, the parties announced a resolution of the SARE Motion and requested the court to continue the hearings on the motion to dismiss and the DIP Motion to January 15, 2026. The consent order designating the case as a SARE case was not entered until February 5, 2026, D.E. 76.

[2] USC asserted in its initial response to the DIP Motion that it was willing to extend funds to complete construction on the condition that "an independent general contractor be employed to complete the construction and that none of the insiders or affiliated entities of [Nova's principal] would be employed by the Debtor or the new independent general contractor for any services." D.E. 49 at ¶ 7.viii.

On January 14, 2026, USC filed a second response in opposition to Nova's DIP Motion, D.E. 61, and included in that response a proposal for USC to provide DIP financing in the amount of $4,100,000 at 12% per annum with a 1% origination and disbursement fee, and, among other terms, this covenant:

> Neither Abraham Building Company, Inc. nor Abraham Ng'Hwani or any affiliate or insider of either company or individual shall act as a general contractor or as a subcontractor to undertake any work on the project and that the Debtor agrees to employee an independent general contractor to complete the work. Lender has obtained recognized entities who are willing to begin construction on the project within the next week or so.

*Id.* at 2. Because USC already holds the first lien on the property, its proposal would not have required a priming lien, but instead would increase the amount secured by its existing first lien.

USC also filed its proof of claim on January 14, 2026, asserting a claim secured by a first lien on the real property and other collateral in the amount of $10,526,210.53. Claim No. 1-1. The claim indicates a per diem of $6,651.21, calculated using the default rate of interest. Claim No. 1-1, Part 2 at 4. The second lienholder, UGro, LLC, filed a proof of claim on January 30, 2026, asserting a secured claim in the amount of $3,398,470.26. Claim No. 3-1. The evidence presented at the January 15, 2026 hearing included, for purposes of the interim hearing only, a stipulation that the "as is" value of the property was $21,800,000.

The court convened the January 15, 2026 hearing approximately 1.5 hours after its scheduled time to allow the parties to confer. USC first proceeded with argument on its motion to dismiss for lack of authority. The court denied the motion from the bench, finding that Nova had authority to file the chapter 11 petition. The court then turned to the DIP Motion, with Nova indicating it wished to proceed with funding from SRS in the interim amount of $1,100,000, which would be sufficient for it to complete construction of one apartment building and resume construction on the other two buildings. Nova also agreed to have an independent construction

professional review the construction progress and evaluate whether Nova's use of affiliated contractors was appropriate and on market or better-than-market terms. At that time, Nova contemplated returning in approximately 30 days to report on the status of construction and, if needed, request an additional draw. In closing arguments on the DIP Motion in January 2026, the discussion centered around ensuring that interim approval of the SRS funding would not preclude USC from making a formal proposal for the balance of the needed funds.

The court allowed the DIP Motion on an interim basis, providing SRS a priming lien for the initial draw of $1.1 million, which was documented by order dated January 29, 2026. D.E. 65. That order set a second interim hearing for February 18, 2026. On February 5, 2026, USC filed a motion to reconsider the January 29, 2026 order, contending that the court committed a clear error of law in allowing the priming lien because USC had offered financing on more favorable terms. D.E. 72. The court swiftly denied the motion to reconsider, noting in its order of February 27, 2026 that there was no competing offer from USC before the court at the January 16, 2026 hearing, and that "Rule 59 does not contemplate a party's proffer of after-the-fact evidence to support reconsideration of an order entered after a full evidentiary hearing." D.E. 98 at 6.

The hearing to consider the second advance of DIP financing was continued a number of times, with some of the continuances at the request of USC and some at the request of Nova. Similarly, Nova requested and obtained further extensions of time to file its chapter 11 plan through February 20, 2026, then February 23, 2026, then March 2, 2026, and, finally, through March 6, 2026. The parties also required court intervention to obtain agreement on the designated third-party construction consultant, Christian Daniels, as well as to direct the exchange of information related to the DIP financing already approved.

On March 6, 2026, one day before the SARE provisions of the Bankruptcy Code would have mandated relief from the automatic stay in favor of USC, Nova filed its chapter 11 plan of reorganization and disclosure statement, D.E. 113, 114. The court conditionally approved the disclosure statement and set the hearing on confirmation for May 20, 2026, with deadlines to object to the disclosure statement and confirmation set for April 10, 2026 and May 13, 2026, respectively. D.E. 117. Thereafter, USC objected to Nova's employment of the third-party construction consultant, D.E. 124, filed another objection to the DIP Motion, D.E. 127, and objected to the disclosure statement. D.E. 136. The hearing on a second advance under the DIP Motion was continued to May 11, 2026, and the court added the hearing on the disclosure statement to that date. On April 20, 2026, USC filed a motion for relief from stay, D.E. 142. The court also continued the hearings scheduled for May 11, on motion of USC, to May 20, 2026, D.E. 145, and added the motion for relief from stay to that hearing date.

On May 14, 2026, Nova filed a motion to continue all of the hearings scheduled for May 20, 2026, D.E. 154, contending that it intended to rely on a prepetition appraisal procured by UGro with the express consent of UGro, and that USC, as collateral agent for UGro, had withdrawn the consent to use the appraisal. Because the debtor's motions turned on the value of the property, it requested additional time to obtain a new appraisal. *Id.* Indeed, the same day, UGro filed a notice that Nova was not authorized to use its appraisal, D.E. 155. USC filed two responses in opposition to Nova's request to continue the hearing, D.E. 156 and 158. The court conducted a hearing on the motion to continue on May 18, 2026, and once the court made it clear that Nova would be given an opportunity to procure a new appraisal, the parties agreed that the hearings should be bifurcated for the court to consider the valuation evidence and determine the value of the property before hearing the remaining matters – confirmation, DIP financing, and stay relief – on the merits. After

numerous scheduling false starts and a suggestion by the parties that bifurcation was no longer needed or requested, and after several orders extending the automatic stay through the conclusion of the substantive hearings, the court finally conducted an evidentiary hearing on all matters over two days, August 4 and August 18, 2026. Abraham Ng'hwani testified on behalf of Nova, and Seth Weissman testified on behalf of USC. The court took all matters under advisement at the conclusion of the hearings.

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) that this court is authorized to hear and determine. The United States District Court for the Eastern District of North Carolina has referred this case and this proceeding to this court under 28 U.S.C. § 157(a) by its General Order of Reference entered on August 3, 1984. This proceeding is constitutionally core, and this court may enter final orders herein. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

### I. VALUATION

Nova's plan proposes to retain the property and pay creditors through refinancing after construction is complete and the property is stabilized through third-party leases. All of the issues before the court are informed by the value of the property: adequate protection of USC and UGro in light of the SRS priming lien; deferral of any payments to USC and UGro for another 10-12 months under the plan; plan feasibility; and stay relief separate and apart from the SARE provisions (for example, lack of adequate protection). In recognition that this element is essential to all of the issues, the parties presented appraisal testimony to support their respective values. For

purposes of stay relief, USC has the burden of proving the debtor's equity in the property. 11 U.S.C. § 362(g). For purposes of plan confirmation and DIP financing, Nova has the burden of proof. Because this case turns on whether the plan can be confirmed, the court will place the burden of proof on Nova. *See In re Fall Creek One, LLC*, 677 B.R. 219 (Bankr. M.D.N.C. 2025); *see also In re Dunson*, 515 B.R. 387, 390 (Bankr. N.D. Ga. 2014) (gathering cases and determining that the debtor carries burden of proof in a proceeding under § 506 to value collateral for purposes of plan confirmation).

The property is a proposed multifamily development, remains under construction, and consists of three partially complete buildings. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 00:59:30; Aug. 4, 2026 Hrg. T'script, D.E. 210 at 69; Nova Ex. 1 at 2. Each building is at various stages of completion. Nova's estimated cost to complete construction is $3,100,000. Nova Ex. 1 at 2. Upon completion, the property will house 83 multifamily units of different sizes, with unconditioned breezeway corridors and surface parking. Nova Ex. 1 at 2. Amenities include storage units, electric vehicle charging stations, a gym, and a leasing office. *Id.* The interior of each apartment is described as "Class A," featuring quartz counters, modern shaker style cabinetry, kitchen islands, brushed nickel hardware, and stainless-steel appliances. *Id.*; *see also* USC Ex. 9.

Nova tendered the expert opinion and report of Matthew S. Benyon of BBG, Inc. d/b/a BBG Real Estate Services, Nova Ex. 1 (on the court's docket at D.E. 185), in support of its asserted value of the real property. USC tendered the expert opinion and report of James Lynch of Newmark Valuation & Advisory, USC Ex. 9 (on the court's docket at D.E. 142 at 293), in support of its asserted value of the real property. For ease of reference and comparison, the conclusions reached by each are as follows:

| | Benyon | Lynch |
|---|---|---|
| Date of Appraisal | 7/29/2026 | 3/25/2026 |
| Inspection date | 7/24/2026 | 3/25/2026 |
| Market Value as is | $20,500,000 | $14,300,000 |
| Upon Completion | $24,300,000 as of 12/1/2026 | $16,600,000 as of 3/25/2026 |
| Upon Stabilization | $25,400,000 as of 6/1/2027 | $16,900,000 as of 3/25/2026 |

This summary reveals that the appraisers relied on different factors and considerations in developing their valuations and reached substantially different conclusions. Judge Kahn succinctly described the court's authority and obligations for valuing property under these circumstances in *Fall Creek*:

> The Court "has a duty to value property under § 506 even where the appraisals reach very different conclusions." *In re Godwyn*, 651 B.R. 669, 675 (Bankr. E.D.N.C. 2023). "Valuation 'is not an exact science,' and the court must use its judgment in forming a determination as to the value of the [p]roperty." *In re Demery*, 623 B.R. 175, 179 (Bankr. M.D.N.C. 2020) (quoting *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003)). "Often, multiple appraisers provide conflicting valuations, and '[w]hen two appraisal reports conflict, a court must determine the value based on the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning.'" *In re Blackwell*, No. 2:17-BK-20203, 2018 WL 1189257, at *2 (Bankr. S.D.W. Va. Mar. 5, 2018) (quoting *In re 3G Props., LLC*, No. 10-04763-8-JRL, 2011 WL 5902504, at *8 (Bankr. E.D.N.C. July 12, 2011)). However, "a court need not wholly accept the value of one appraiser over another – it can arrive at its own conclusion as to value based on its own interpretation of the evidence." *Id.* In weighing conflicting appraisal testimony, courts look to factors such as "the appraiser's education, training, experience, familiarity with the subject of the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *Id.*

677 B.R. at 224.

Both appraisers weighed different valuation methods to determine the property's value. Mr. Benyon utilized the cost, sales comparison, and income approaches; Mr. Lynch relied on only the sales comparison and income approaches. *See* Nova Ex. 1; Aug. 18, 2026 Hrg. Audio, D.E. 213 at 01:19:35-01:19:46. To establish value under the cost approach, the appraiser considers the costs to replace the property, the cost of the land itself, and any estimated achievable profit, and reduces

that value by the current cost to purchase the structures on the property. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 84. The sales comparison approach is ascertained by considering recent sales of comparable properties. *Id.* While these methods of valuation are probative, both appraisers testified that they gave the most weight to the income approach. *Id.* at 149; Aug. 18, 2026 Hrg. Audio, D.E. 213 at 01:19:35. Courts favor using an income approach to value income-generating property where a debtor intends to retain the property as its sole source of income. *Fall Creek*, 677 B.R. at 226 (explaining that the income approach "considers what an investor in [the property], such as the [d]ebtors, would pay a seller to acquire such properties" (quoting *Dunson*, 515 B.R. at 391)). The income approach to valuation requires an appraiser to evaluate the potential net operating income from rents and other sources and subtract from that amount any expenses; the resulting total is then applied to a projected capitalization rate. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 149. Below, the court reviews the testimony offered by each appraiser in support of each approach.

**Cost approach**

As explained in Mr. Benyon's appraisal report, the cost approach is "based on the principle . . . that no prudent person will pay more for a property than the cost of acquiring a site and constructing . . . an equally desirable and useful property." Nova Ex. 1 at 62. Mr. Benyon determined that the "as is" value of the property under this approach is $20,300,000. *Id.* at 63. To formulate this opinion, he relied in part on the informal cost estimate supplied by the developer (Nova) and comparable costs reported from other multifamily apartments in Durham and Raleigh. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 88. Mr. Benyon testified that he evaluated each sale on a per unit basis and adjusted the per unit value of the properties to better compare each to the subject property. He also testified that this method of valuation was given the least amount of weight in arriving at the property's value. Nevertheless, he also explained that because the property is new

construction, this approach is still relevant to assessing value. *Id.* at 84. Although Mr. Lynch, USC's expert, chose not to rely on the cost approach, Mr. Lynch contends that his choice to forego the analysis ultimately had no effect on the accuracy of his appraisal. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 01:19:35. Instead, Mr. Lynch testified that this valuation method is largely irrelevant because market participants do not value income-producing properties based on the cost of constructing them. *Id.* at 00:24:00. Instead, they are valued based on the amount of revenue they can generate. *Id.*

**Sales comparison approach**

Under the sales comparison approach, Mr. Benyon determined the "as is" value of the property to be $19,600,000 as of July 24, 2026. In reaching this value, Mr. Benyon compared the property with the sales of six other completed apartments in Durham, Monroe, Cary, Holly Springs, and Raleigh, North Carolina. *See* Nova Ex. 1. Mr. Benyon testified that, of the six properties, he placed the most weight on the newness of the properties, followed by location, and then property size. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 108. All of the comparable properties relied on by Mr. Benyon, except for one, were built within the last six years. *See* Nova Ex. 1. Many of the sales comparisons were close in distance to the subject property but were disproportionately large compared to the subject property; five of the comparisons had 70 or more total units. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 109. The sole property with fewer units than the subject had an average unit size of 2,065 square feet, compared to the subject property's average unit size of 1,004 square feet. Each of the comparables required at least a 2% adjustment to determine per-unit pricing. The greatest weight was placed on comparables numbers one and six, because each property was sold within the last six years, but Mr. Benyon did consider the totality of the circumstances in arriving at his final value. *Id.* at 123. Importantly, the sales comparison approach

as applied by Mr. Benyon required him to compare the sale of completed and stabilized properties, then adjust the comparables down to establish the "as complete" and "as is" values. Although these adjustments aided in assessing the sales comparison value of the property, Mr. Benyon did concede that "[t]here is a point at which doing too many or too large of an adjustment makes it not . . . useful as a comparison." *Id.* at 113.

Using the same approach, Mr. Lynch concluded that the "as is" value of the property was $14,600,000 as of March 25, 2026. USC Ex. 9 at 57. Mr. Lynch compared the property with the sales of five other completed apartments in Raeford, Greensboro, Charlotte, and Graham, North Carolina. *See id.* at 58. As with Mr. Benyon's analysis, Mr. Lynch testified that this approach required him to find comparable properties and adjust their sale price based on amenities, location, and age to ultimately determine a per-unit price. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 01:27:00. A specific explanation of each adjustment was not identified in the report; instead, Mr. Lynch wrapped all adjustments into a single data point. *Id.* at 01:28:00. As with Mr. Benyon, newness was the most important factor in Mr. Lynch's analysis, and all of the comparable properties were built within the last six years. Mr. Lynch's comparison was determined as of March 25, 2026, and while he admits that it would be difficult to ascertain what rents could be charged in six or eight months from appraisal, he still believes that the sales comparison value he estimated is probative of the property's value. *Id.* at 02:16:59-02:17:12.

**Income approach**

"Under the income approach, the present value of future income is determined by: (1) estimating future income, (2) deducting expenses, and (3) applying a capitalization rate." *Fall Creek*, 677 B.R. at 226 (citing *In re Diamond Beach VP, LP*, 506 B.R. 701, 715 (Bankr. S.D. Tex. 2014), *aff'd*, 551 B.R. 590 (S.D. Tex. 2016)). Using that approach, Mr. Benyon determined that

the "as is" value of the property is $20,500,000. Nova Ex. 1 at 66, 74, 96. To establish this value, he considered seven different comparable properties within Durham County to determine the potential net operating income for the subject property. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 126. As with the sales comparison approach, the value was then adjusted down to determine the value "as complete," and then further adjusted by the cost to complete to determine the "as is" value of the property.

The income analysis hinges on finding properties that would act as Nova's primary competitors and then extrapolating what rent Nova could charge on a unit-by-unit basis. *Id.* at 125. As with the sales comparison approach, the most weight was given to newness, location, property type, and quality of appliances and interior amenities. *Id.* In consideration of those factors, Mr. Benyon determined that the property would support rents for the one-bedroom / one-bathroom apartments between $1,650 and $1,725 per month; rents between $1,950 and $2,075 per month for the two-bedroom / two-bathroom apartments; and rents of $2,300 for the three-bedroom / two-bathroom apartments. *Id*. at 150. Taking these rents together with other ancillary income, and reduced by vacancy and collection losses, the property's annual effective gross income was estimated to be $2,023,081 as stabilized. Nova Ex. 1 at 85. Expenses were estimated by reviewing comparable expenses in the local market and comparing those with estimates provided by Nova. The most weight was given to the market comparables and ultimately determined to be higher than anticipated by the developer (Nova) at $689,509 per year. Nova Ex. 1 at 85; D.E. 210 at 141. Finally, Mr. Benyon employed a capitalization rate of 5.25%, derived from data from the sales comparison analysis above. D.E. 210 at 142; Nova Ex. 1 at 91.

USC's expert, Mr. Lynch, found the "as is" value of the property under the income approach to be $14,300,000. USC Ex. 9 at 81. This approach was given the most weight in his

analysis. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 00:23:22. Unlike Mr. Benyon, the comparative rent analysis Mr. Lynch performed included only garden-style properties within Durham. *Id.* at 00:26:20. Mid-rise apartments were excluded from the rent comparison; Mr. Lynch deemed those properties to be incomparable because they typically have superior amenities and construction to garden-style properties. *Id.* at 00:26:40. Instead, his appraisal gave the most weight to location near the subject property, then age, and, finally, amenities. *Id.* at 00:27:30. Mr. Lynch also gave less weight to the newness of construction as compared to Mr. Benyon because he believed the newness of a property became a motivating factor only where all other aspects of the properties were the same. *Id.* at 00:28:30, 01:12:30. In consideration of those factors, Mr. Lynch ultimately determined that the property would support rents for the one-bedroom / one-bathroom apartments of approximately $1,550 per month; $1,790 per month for the two-bedroom / two-bathroom apartments; and $2,057 per month for the three-bedroom / two-bathroom apartments. *Id.* at 00:36:00. Taking these rents together with other ancillary income, and reduced by vacancy and collection losses, the property's annual effective gross income was estimated to be $1,752,337 as stabilized. USC Ex. 9 at 72; Aug. 18, 2026 Hrg. Audio, D.E. 213 at 00:37:30. Expenses were estimated by reviewing comparable expenses in the local market. No adjustments were made in this comparable analysis to the size or age of the comparables, and Mr. Lynch testified that he chose a number slightly lower than average. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 02:13:10. Mr. Lynch ultimately determined that the annualized expenses were slightly higher than Nova's estimate at $764,483. *Id.* at 00:39:11. Finally, Mr. Lynch utilized a capitalization rate of 5.75%, which he derived by utilizing data from the sales comparison, bands of investments, and investor interviews. *Id.* at 00:42:00; USC Ex. 9 at 77. Mr. Lynch ultimately excluded larger mid-rise buildings in this analysis because, he maintained, including those properties would increase the

buying pool, thereby artificially decreasing the capitalization rate. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 00:43:30, 00:46:00.

**The Parties' Critiques of the Appraisals**

In its closing argument, USC contended that the properties Mr. Benyon used to establish the "as is" value are not truly comparable, resulting in inflated rents and an artificially lower capitalization rate. These differences, USC maintains, make up the nearly $6,000,000 delta in value between Mr. Benyon's and Mr. Lynch's appraisals. USC argues that Mr. Benyon gave outsized weight to new construction and ignored other market realities. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 06:45:40. For instance, Mr. Benyon testified that he gave the most weight in his analysis to rent comparison number one, Kelby Farms. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 151. While Kelby Farms had similar in-unit amenities to the subject property, the exterior amenities were far superior. *Id.* at 152-54. In addition to all the amenities on site at Nova Summer Meadow, Kelby Farms has a bike storage unit, game and media room, demonstration kitchens, outdoor firepits, co-working spaces, and a pool. *Id.* at 152-53. Moreover, while Mr. Benyon considered Kelby Farms on par, or better than, the subject property, Kelby Farms offered tenants two-month rent concessions and lower rents overall. *Id.* at 154. Comparable one-bedroom / one-bathroom apartments at Kelby Farms were leased for only $1,484 per month, and the comparable two-bedroom / two-bathroom apartments were priced at $1,756. *Id.* The same was true for rent comparable number two, Fox Crossing, which was also given greater weight because it was constructed in 2024. *Id.* at 156-61. Mr. Benyon testified that Fox Crossing had superior amenities, larger units, and similar interior furnishings to the subject property. He also testified that superior amenities could move the needle for potential renters. *Id.* at 182. Nevertheless, similar to Kelby Farms, Fox Crossing offered lower rents for one-bedroom / one-bathroom apartments at only

$1,486 per month. *Id.* The same pattern emerged for all of Mr. Benyon's rent comparisons. *Id.* at 175-76.

USC also criticized that each of the properties used by Mr. Benyon for his sales comparison approach to estimate an appropriate market capitalization rate were incomparable because they included mid-rise apartments and slightly older sales from a time when more favorable conditions existed, citing his testimony, Aug. 4, 2026 Hrg. T'script D.E. 210 at 208. USC contends that Mr. Benyon's conclusion conflicts with the general market trend he identified: lower rents and higher capitalization rates. *Id.* at 149, 198. As Mr. Benyon explained, mid-rise apartments typically have air-conditioned interior corridors, elevators, are four to five stories, and have a larger number of units; garden style apartments like the subject property are smaller, have fewer amenities, are not serviced by elevators, and typically have breezeway exteriors. *Id.* at 185-86. USC counters that larger buildings can attract larger institutional investors, who in turn provide lower capitalization rates. For instance, sale comparison number one, University Hill, is a mid-rise apartment with a reported capitalization rate of 5.03%. *Id.* at 188. Sale comparison number two, The Cottages of Monroe, has more units than the subject property, superior amenities, and detached homes, with a reported capitalization rate of 5.00%. *Id.* at 192. Mr. Benyon testified that the remaining properties were either of a different kind or involved different markets than the subject property. *Id.* at 203. Nevertheless, he concluded that the capitalization rate of 5.25% was reasonable given market conditions.

In its closing argument, Nova contended that Mr. Lynch's March 25, 2026 appraisal report has gone stale. Aug. 18, 2026 Hrg. Audio, D.E. 13 at 05:32:00-05:32:40. Nova criticizes that there were no adjustments made to critical metrics used in the comparative sale analysis, resulting in the use of non-comparable sales. Most importantly, Nova maintains, Mr. Lynch did not provide

sufficient justification for his expert opinion; in other words, he did not show his math. *Id.* at 05:35:00. Instead, he offered conclusions resulting in an arbitrary valuation. *Id.* None of the rent comparables were adjusted based on age, size, or location, and many of the rent comparables were significantly older than the subject property. *Id.* at 01:55:00, 01:58:30, 02:00:20. For example, rent comparable number one, Atrium, was constructed in 1989, has a lower average size per rental unit, and has no three-bedroom / two-bathroom units. *Id.* Atrium did have significant, but aged, amenities. *Id.* at 02:18:00. The primary factor that Mr. Lynch considered was the location of the comparable properties, but he also testified that his analysis averaged the rent comparisons to ultimately determine an appropriate rent for the subject property. He provided no analysis in his report explaining how he came to this conclusion. *Id.* at 02:03:22.

In considering the sale comparisons that ultimately determined the capitalization rate of the property, Mr. Lynch relied on properties identified in the Greensboro, Raeford, and Charlotte submarkets, which Nova contends are not comparable. *Id.* For instance, sales comparison number five, South Pointe at Wayside, had nearly twice as many units as the subject property and was nearly twice as large, but only received a 20% adjustment to ascertain the per unit sales price of the property; sales comparison two, Meadows of Graham, which was purportedly the most similar to the subject property with 68 units in Graham, North Carolina, also had a 20% adjustment. USC Ex. 9 at 61. In general, Nova argues, Mr. Lynch made no adjustments based on the size of the properties even though most were different in size than the subject property. *Id.* The only property that did receive a size adjustment was South Pointe at Wayside, which is twice as large as the subject property. *Id.* While he did make other adjustments, these adjustments were wrapped into a singular data point rather than itemized. *Id.* at 01:26:00-01:26:30. Further, even though time had passed since his appraisal, Mr. Lynch believed that his appraisal was still relevant because market

conditions, like the availability of rent concessions and the increase in new construction, are constant. *Id.* at 01:14:30.

**Analysis and Conclusion of Value**

The court is not persuaded that either appraiser reached the correct value. As noted by Judge Kahn in *Fall Creek*, "a court need not wholly accept the value of one appraiser over another – it can arrive at its own conclusion as to value based on its own interpretation of the evidence." 677 B.R. at 224 (citing *Blackwell*, 2018 WL 1189257, at *2). The court may also consider the debtor's projections. *See Fall Creek*, 677 B.R. at 228 ("The best indication of what the debtor projects as income and expenses, which forms the basis of valuation according to both appraisers, is the debtor's own projections on which it relies for confirmation.").

Specifically, Mr. Lynch relied on comparables in unsimilar markets and did not show the math on adjustments he may have made for size, location, age, or amenities. Mr. Benyon's rent values were inflated and his capitalization rate was unrealistic. Nova's projections are similarly overoptimistic about what rental rates it is likely to obtain. Mr. Benyon's projected operating expenses started with Nova's projections and were appropriately adjusted, and the court adopts Mr. Benyon's expenses for purposes of the income capitalization method. Mr. Lynch used a 2025 cost to complete budget, whereas Mr. Benyon relied on Nova's cost to complete as submitted in conjunction with the DIP Motion. Both applied an entrepreneurial profit to the completion cost. The court adopts Mr. Benyon's completion cost based on the cumulative evidence before it establishing the cost to complete.

After conducting a thorough review of each appraiser's projected rents and comparables upon which those rents are based, as well as Nova's projected rents as noted in Mr. Benyon's appraisal, the court reached its own conclusion as to the average rent rate per unit size (noting that

there are varying square footage sizes for the one bedroom / one bathroom and two bedroom / two bathroom apartments, and taking an average within those), applied "other income" as included in the debtor's projections, Nova Ex. 30, applied a 7.5% vacancy and collection loss, and adopted Mr. Benyon's operating expense conclusion, resulting in a net operating income figure of $1,203,807. The court then applied three capitalization rates for purposes of comparison to reach three "as stabilized" values.

| | Benyon | Lynch | Debtor Ex. 30 "Current Market Rate" | Court |
|---|---|---|---|---|
| 24 - 1 BR / 1 BA | 1650-1725 | 1550 | 1613-1711 (per Nova Ex. 1 at 77) | 1625 |
| 47 - 2 BR/ 2 BA | 1950-2075 | 1790 | 2072-2244 (per Nova Ex. 1 at 78) | 1900 |
| 12 - 3 BR/3 BA | 2300 | 2057 | 2463 (per Nova Ex. 1 at 79) | 2200 |
| Total base rent income | 1,936,500 | 1,752,377 | 2,069,412 | 1,856,400 |
| | | | | |
| Other income | 231,820 | 117,113 | 190,428 | 190,428 |
| Vacancy and collection loss | (7.5%) 145,238 | (7.5%) 131,428 | 206,941 | (7.5%) 153,512 |
| Effective gross income | 2,023,081 | 1,738,061 | 2,052,899 | 1,893,316 |
| | | | | |
| Operating expenses | 689,509 | 764,483 | 591,371 | 689,509 |
| Total NOI | 1,333,572 | 973,579 | 1,461,528 | **1,203,807** |
| | | | | |
| /5.25% | 25,401,371 | 18,544,361 | 27,819,580 | **22,929,657** |
| /5.5% | 24,246,763 | 17,701,436 | 26,573,236 | **21,887,400** |
| /5.75% | 23,192,556 | 16,931,808 | 25,417,878 | **20,935,773** |

After determining the "as stabilized" value, the cost to complete is deducted to reach the "as is" value. As noted above, the court adopts Nova's cost to complete based on evidence presented throughout these proceedings including in conjunction with the DIP Motion, and applies Mr. Benyon's entrepreneurial profit of approximately 11%, to reach the following "as is" values:

| Applied cap rate | As Stabilized | Minus completion adjustment | As Is value |
|---|---|---|---|
| 5.25% | 22,929,657 | $3,829,000 | 19,100,657 |
| 5.5% | 21,887,400 | $3,829,000 | 18,058,400 |
| 5.75% | 20,935,773 | $3,829,000 | 17,106,773 |

The court further finds, based on the market evidence contained in both appraisals, that 5.5% is the most appropriate capitalization rate, and, therefore, concludes that the "as is" value of the property is **$18,058,400**, and the "as stabilized" value is **$21,887,400**.

## II. PLAN CONFIRMATION

Nova's proposed chapter 11 plan, D.E. 113, provides for the treatment of ten classes of claimants, as follows:

> Class 1, Administrative Claims consisting of debtor's counsel and construction consultant, which are impaired under the plan. Claims are to be paid in full within 10 days of the effective date unless agreed otherwise.
>
> Class 2, Ad Valorem Tax Claims of Durham County[3] and the City of Durham, which are unimpaired under the plan. Claims are to be paid within one year of the effective date with applicable state law interest.
>
> Class 3, Priority tax claims, none known but claims to be paid as required by the Bankruptcy Code and would be unimpaired under the plan.
>
> Class 4, Priority non-tax claims, none known but would be paid in full on effective date.
>
> Class 5, Southern Resolution Services, to be treated in accordance with the DIP financing documents and is therefore unimpaired under the plan.
>
> Class 6, Secured claim of UGro in the amount of 3,398.470.26, to be paid in full at 10% per annum on the earlier of July 1, 2027 or the first anniversary of the effective date.
>
> Class 7, Secured claim of USC in the amount of $10,526,310.53, to be paid in full at 10% per annum on the earlier of July 1, 2027 or the first anniversary of the effective date.
>
> Class 8, Executory Contracts and Unexpired Leases, none identified.

[3] Durham County filed a proof of claim on May 26, 2026, Claim No. 6-1, in the amount of $257,305.31, for ad valorem taxes. There is no attachment or explanation of the time period for which these taxes may have accrued. Interestingly, and not taken as evidence of anything, that proof of clam lists the value of the real property as $24,719,603.

Class 9, General Unsecured Claims, to be paid in full at the greater of the federal judgment rate or 5% per annum on the effective date. Any funds collected through avoidance actions will be distributed to this class in order of priority.

Class 10, Equity Holders. All membership interests held by Nova at Summer Meadow, LLC [the 100% member of Nova at Summer Meadow Owner, LLC] will be canceled on effective date and reissued to Nova at Summer Meadow LLC upon payment of a new value contribution in the amount of $50,000.

D.E. 113 at 13-24.

The plan provides as its means of implementation that Nova will complete construction of the property and, as construction is completed on each of the three buildings, it will lease the units to third parties. Nova estimates that construction will be complete by January 2027, and "once construction and development has been completed, and based upon its prior discussions with various financial institutions," Nova anticipates obtaining financing to pay all allowed claims in full as provided in the plan. D.E. 113 at 24.

According to the Report on Ballots filed on August 3, 2026, votes were cast as follows:

Class 1, accepts

Class 2, no ballot (unimpaired, deemed to accept)

Class 3, no ballot (unimpaired, deemed to accept)

Class 4, no ballot (no creditors)

Class 5, no ballot (unimpaired, deemed to accept)

Class 6, rejects

Class 7, rejects

Class 8, no ballot (no creditors)

Class 9, 3 of 3 voting creditors accept (insider Abranova Building Company, accepted with a claim of $640,757.44; unrelated entities Herc Rentals and VSC Fire & Security accepted with claims of $6,918.10 and $125,618.00, respectively); remaining creditors did not vote

Class 10, accepts

D.E. 193.

Because not all classes have voted in favor of the plan, confirmation must be considered under 11 U.S.C. § 1129(b). That section requires the court to find that the debtor has met all of the requirements of § 1129(a), with the exception of § 1129(a)(8), which requires acceptance of the plan by all impaired classes. If the debtor has met all other provisions, then it must also meet the specific requirements of § 1129(b) to confirm a plan over the objection of creditors.

**Accepting Impaired Class**

USC contends that Nova cannot show an accepting impaired class of claimants as required to proceed with confirmation pursuant to § 1129(a)(10). That section provides that if there is an impaired class of claims, at least one impaired class must vote to accept the plan without including acceptance of the plan by any insider. Nova contends that its general unsecured class, Class 9, has accepted the plan by virtue of the two non-insider voting creditors, Herc Rentals and VSC Fire & Security. USC contends that the court should count all eligible non-voting claimants as rejecting the plan.

Class acceptance is determined in accordance with § 1126(c). That section provides:

> (c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, ***that have accepted or rejected such plan***.

11 U.S.C. § 1126(c) (emphasis added). The court finds this language to be clear and unambiguous. The debtor must only establish that the plan has been accepted by at least two-thirds in amount and more than one-half in number of the claims in the class ***that actually cast ballots***, not the claims in the class that were eligible to vote. Because all of the non-insider claimants that voted in

Class 9 accepted the plan, that class has accepted the plan under § 1126(c) and the "accepting impaired class" requirement of 1129(a) is satisfied.

**Fair and Equitable**

USC contends that the plan is not fair and equitable to USC or UGro because Nova's proposed interest rate of 10% is neither a market interest rate nor a rate sufficient to protect the creditors' interests. Specifically, USC maintains, and its argument is supported by the testimony of Mr. Weissman, that the priming lien of SRS, combined with USC's contention that there is little to no equity in the real property above the combined debt amount, substantially increased the risk of nonpayment to USC and to UGro. USC further contends that in demanding an interest rate of 13%, SRS recognized the risks of the project; to provide a *lower* interest rate to the second- and third-position lienholders simply does not reflect any market reality. Nova contends that the plan is fair and equitable to USC and UGro because the plan will pay the creditors in full upon completion of the construction project; Nova expects to refinance the loans at the proposed or lower interest rates.

Section 1129(b) provides that a plan may be confirmed under that subsection "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b). "The prohibition under section 1129(b)(1) is against 'unfair discrimination' and not simply discrimination of any kind." *In re Renegade Holdings, Inc.*, 429 B.R. 502, 521 (Bankr. M.D.N.C. 2010). Further, "the plan must literally *be* fair and equitable." *In re Wiggins Farms, Inc.*, No. 12-02651-8-RDD, 2012 WL 6059208 (Bankr. E.D.N.C. Dec. 6, 2012) (emphasis added).

Moreover, as applicable in this case, the court considers the "fair and equitable" requirement specifically set forth in the statute:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides –
>
> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2).

"[T]his requirement obligates the court to select a rate [of interest] high enough to compensate the creditor for its risk but not so high as to doom the plan." *Till v. SCS Credit Corp.*, 541 U.S. 465, 480 (2004). "Thus, a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose." *Id.* at 476-77. "Rather, the court should aim to treat similarly situated creditors similarly, and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default." *Id.* at 477. Accordingly, a chapter 11 plan may reduce an interest rate. *See In re Price Funeral Home, Inc.*, No. 08-04816-8-ATS, 2008 WL 5225845, at *3 (Bankr. E.D.N.C. Dec. 12, 2008).

Mr. Weissman described Nova's agreements with USC and UGro as comparable to mezzanine loans because "we're effectively equity at this point, if we're at not above equity." Weissman testimony, Aug. 4, 2026 Hrg. T'script, D.E. 210 at 232. To effectively compensate USC and UGro for the risk of post-confirmation default under the plan, Mr. Weissman testified that "an 18 to 20 percent interest rate would be appropriate, if not low." *Id.*

Mr. Ng'hwani, on the other hand, testified that the interest rate for USC at 10% was fair based on his conversations with undisclosed entities about market rates, Aug. 18, 2026 Hrg. Audio, D.E. 213 at 3:47:50, 5:04:30, 5:24:20, but he did not provide any evidence of market rates. *See Wiggins Farms*, 2012 WL 6059208, at *5 (finding that a plan is not fair and equitable when it does not establish a market rate of interest). Moreover, Mr. Ng'hwani testified that he did not believe that Nova was required to honor the contractual interest rates or award USC a higher interest rate than SRS under the plan because "chapter 11 financing is not a normal scenario." Aug. 18, 2026 Hrg. Audio, D.E. 213 at 5:01:00. Mr. Ng'hwani also stated that the proposed interest rate afforded USC and UGro a sufficient equity cushion because he estimated that the property would be worth $28 million upon completion. *Id.* at 3:49:30.

However, there is no credible evidence that the property will be worth $28 million as of the effective date of the plan or at the time refinancing will be required. *See* 11 U.S.C. § 1129(b)(2)(B)(i). Nova has also not provided any evidence that repaying USC's loan at a 10% interest rate would afford the creditor "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." *See* 5 *Collier on Bankruptcy* 1129.03[i] ("The concept of 'present value' is of paramount importance to an understanding of 1129(b) [because] a dollar in hand today is worth

exactly the same as (i) a dollar to be received a day, a month, or a year hence plus (ii) the rate of interest which the dollar would earn if invested at an appropriate interest rate.”).

Absent actual evidence of a market rate for chapter 11 exit financing, a court must determine whether the proposed rate is “high enough to compensate the creditor for its risk but not so high as to doom the plan” under *Till*. Judge Leonard of this court previously examined the applicability of *Till* in a chapter 11 context, noting that

> [n]otwithstanding the fact that there may be a market for exit financing in chapter 11, the cram down provisions with respect to secured creditors in chapter 13 (§ 1325(a)(5)(B)(ii)) and in chapter 11 (§ 1129(b)(2)(A)(i)(II)) are virtually identical, and a strong argument can be made that the same standard should apply in both chapters. However, in this case neither side presented convincing evidence regarding the applicable market rate for such financing, and the court will apply the *Till* standard starting with the prime rate and increasing the rate to account for the risk involved.

*In re Smithville Crossing, LLC*, No. 11-02573-8-JRL, 2011 WL 5909527, at *8 (Bankr. E.D.N.C. Sept. 28, 2011). There, he considered how to apply *Till* in the absence of evidence of a relevant market:

> There is always a price at which someone would make a loan, but *Till v. SCS Credit Corp.,* 541 U.S. 465 (2004), requires there be an “effective market” for the market rate to control. Concluding that there is no market, the court will turn instead to *Till*’s formula approach to construct a rate. “The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.” *Id.* at 479. Secondary factors include the loan to value ratio and quality of the guarantors. The final rate is determined by the plan before the court at confirmation. For purposes of this motion, the court concludes that a risk adjustment of 3 to 5% above prime will be required, depending on the final facts as they appear at confirmation.

*Id.*

The court takes judicial notice that the prime rate as of the second date of the confirmation hearing, August 18, 2026, was 6.75%.[4] It rose to 7.0% on September 17, 2026, which would also be the prime rate on the effective date of the plan (October 1, 2026, had the plan been confirmed at the confirmation hearing). The plan proposes to complete construction and refinance the debt such that it will pay USC and UGro, both at 10% per annum, on July 1, 2027, with no interim payments before that date. The non-default contract rates are 12% and 14%, respectively. By July 1, 2027, neither secured creditor will have received any service on its loan for more than two years. Applying the hearing date prime rate of 6.75%, the proposal is for Nova to pay USC and UGro, now in subordinate positions, prime plus 3.25%, while it has agreed to pay SRS, in the first lien position, prime plus 6.25%. If Nova were able to complete construction, the value of the real estate collateral would only increase, but there is substantial risk of a decrease in the value, and increased costs to complete construction, as long as the project is stalled. Accordingly, the court finds an interest rate below USC's and UGro's nondefault contract rate is not fair in this case.

Accordingly, because the plan proposes an interest rate that the court finds not to be fair, the plan is not fair and equitable to USC or UGro and cannot be confirmed.

**Feasibility**

USC contends that the proposed plan is a "hope plan," not a feasible plan, due to Nova's failure both to seek approval from the court for the entirety of the funding necessary to finish construction and to obtain a commitment for post-confirmation financing. D.E. 152 at 14. Nova

---

[4] *See Current Prime Rate*, Commerce Bank, https://www.commercebank.com/about-us/prime-rate-update (last visited Oct. 19, 2026). The court references the *Smithville* and *Till* analysis as a comparison point for whether Nova's proposed interest rate is fair, but the court is not required to reach a conclusion as to what the interest rate should be and is not holding that the *Smithville* analysis would be the ultimate determining guideline.

argues, based on its conversations with regional banks and the property's prime location, that it will easily obtain post-confirmation financing and, therefore, it has proffered a feasible plan.

Section 1129(a)(11) of the Bankruptcy Code requires that for a plan to be confirmable, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement is often called the feasibility requirement. *In re A.H. Robins, Co., Inc.* 880 F.2d 694, 698 (4th Cir. 1989), *overruled on other grounds by Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). This feasibility requirement "is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *In re Tree of Life Church*, 522 B.R. 849, 864 (Bankr. D.S.C. 2015) (quoting *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988)).

Factors for analyzing feasibility include: "the adequacy of the capital structure; the earning power of the business; economic conditions; the ability of management; the probability of the continuation of the same management; and any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *Id.* at 865 (internal quotation omitted). The feasibility test "contemplates the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Cheatham*, 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987) (cleaned up); *see also In re Repurchase Corp.*, 332 B.R. 336, 343-44 (Bankr. N.D. Ill. 2005) (determining that a debtor principal's statement that a third party would contribute needed capital was "sheer speculation and wishful thinking" that

could not support the feasibility of the plan in the "absence of any form of corroboration or contract from the alleged sources of the[] funds").

In other words, feasibility is "firmly rooted in predictions based on objective fact." *Cheatham*, 78 B.R. at 109 (quoting *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)). Thus, the court will not approve the plan if it "is no more than 'hope' and is not a realistic prospect for a successful reorganization." *In re Asheville Bldg. Assocs.*, 93 B.R. 913, 917 (Bankr. W.D.N.C. 1988). "The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence." *Wiggins Farms*, 2012 WL 6059208 at *2 (citing *F.H. Partners, L.P. v. Inv. Co. of Sw, Inc., Four Hills Assocs., and Bank of Am. (In re Inv. Co. of Sw., Inc.)*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006)).

Nova's stated means of implementation of the plan is to complete construction and then refinance the project to pay all creditors in full. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 3:37:15, 4:56:20. However, to complete construction, Mr. Ng'hwani testified that Nova must receive the requested $3.5 million in DIP financing, *id.* at 2:35:20, 4:09:45, the full amount of which the court has not approved. Mr. Ng'hwani stated that some regional banks, including First Horizon and TowneBank, had also been interested in DIP financing, *id.* at 2:50:40-2:52:30. If the court were to approve the DIP financing, Nova has established through the testimony of Mr. Daniels and Mr. Ng'hwani that it could complete construction of the project within three months, or by December 2026 based on the hearing date.[5] *Id.* at 2:34:20; Aug. 4, 2026 Hrg. T'script, D.E. 210 at 30.

---

[5] After initially failing to answer the question directly, Mr. Ng'hwani acknowledged that all three buildings must be completed before any certificates of occupancy will be issued. Aug. 18, 2026 Hrg Audio, D.E. 213 at 3:54:15, 4:57:00.

Mr. Benyon, who appraised the property in July 2026, testified that he believed the property would stabilize by June 2027. Aug. 4, 2026 Hrg. T'script, D.E. 210 at 68-69. Mr. Benyon explained that he based that timeline on the "lease up velocity of other properties[]" in the surrounding market, including Wake, Orange, and Mecklenburg Counties, D.E. 210 at 71, and based on "population growth, economic growth, [and] new apartment construction" in an area near Duke University, D.E. 210 at 75. Mr. Lynch testified that the area did not have much new, multi-family construction, but had stable occupancy rates. Aug. 18, 2026 Hrg. Audio, D.E. 213 at 10:45, 13:30. The court is satisfied that Nova would be able to lease the apartments and reach stabilization within three to six months after completion based on the testimony of Mr. Benyon and Mr. Lynch with respect to the market trends for lease-up.

However, completion of construction and leasing the property is not the "exit plan" for this case; refinancing the debt and paying all creditors in full is. Mr. Ng'hwani only testified about his efforts to receive prepetition and DIP financing, not exit financing. Short on specifics, he seemed certain that numerous banks would be eager to finance this project with a "mini-perm" loan based on his relationships with those banks. He contended that he had "market feedback" as to the terms on which Nova could obtain refinancing once there is a certificate of occupancy, but he acknowledged that he had no binding term sheets because no lender would commit until construction is complete. In addition, Mr. Ng'hwani during his testimony mentioned other "potential exits," Aug. 18, 2026 Hrg Audio, D.E. 213 at 3:37:00, including that Nova could sell the property, *id.* at 3:53:15, or that he and other investors might be able to cover the plan payments. *Id.* at 3:43:30. Mr. Ng'hwani was short on concrete commitments, instead giving off a sense of "just trust me, if I have the funds to complete the project it will all work out." He has apparently

been successful with other projects, but his description of that success was also nonspecific, other than stating that he has developed $100 million in real estate in the Durham area.

"Potential" exits do not demonstrate feasibility. *See, e.g., In re U.S.A. Parts Supply*, 630 B.R. 487, 493 (N.D.W. Va. 2021) (finding that a plan was not feasible when debtor only provided anecdotal testimony); *Asheville Bldg. Assocs.*, 93 B.R. at 917 (finding no "realistic prospect of effective reorganization" when debtor had not demonstrated a realistic ability to sell the building in a reasonable time); *Wiggins Farms*, 2012 WL 6059208, at *3 (requiring evidence of written contracts instead of relying on principal's testimony to determine that a plan was feasible). Moreover, although Mr. Ng'hwani suggested that Nova would be willing to sell the project as a backup plan, the proposed chapter 11 plan before the court, D.E. 113, does not provide for liquidation if Nova is unable to refinance after the completion of construction.

Not only is there no supportable exit plan, but there is also no evidence to support the feasibility of the other provisions of the plan. The plan provides that after approval of all requested DIP financing in the amount of $4,100,000, SRS will be paid in full at maturity on February 17, 2027. There is no explanation for how that would be paid except through the same promised refinancing generally outlined for paying all the debt. The plan provides that general unsecured creditors will be paid in full with interest on the effective date of the plan, defined as the first date of the first full calendar month following the date an order confirming the plan becomes final, which would have been October 1, 2026 if the court had confirmed the plan at the confirmation hearing. Using rough numbers, the unsecured claims scheduled as undisputed total approximately $1.4 million. The debtor provided no evidence as to how those claims would be paid. Finally, the plan provides that USC and UGro will be paid in full in July 2027, but it does not appear that the

value of the property as stabilized will support payment of those claims once interest is added, even if the request for postpetition default interest is denied.

Because Nova failed to establish any concrete plan to refinance the debt and pay creditors as proposed, instead providing vague assurances that numerous (unspecified) banks would be willing to provide mini-perm financing upon completion of construction and, if not, there were alternative, unspecified "potential" exits that were not included in the chapter 11 plan for scrutiny by the court, the court concludes that the plan as proposed is not feasible as required by the Bankruptcy Code.

Because the court has concluded that the plan is neither fair and equitable nor feasible, the plan cannot be confirmed.[6] In a non-SARE case, the court might allow Nova an opportunity to propose an amended plan to address these issues, but, as described below, the SARE rules mandate a different result in this case.[7]

## III. STAY RELIEF PURSUANT TO 11 U.S.C. § 362(d)(3)

Section 362(d)(3) requires the court to grant relief from the automatic stay in favor of a secured creditor in a SARE case unless one of two specific requirements is met. The statute provides:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

[6] On the dates of the confirmation hearings, Nova was also delinquent with payment of the quarterly fee due for the second quarter of 2026. That would have been an independent basis to deny confirmation, but Nova paid that fee in response to a motion to convert or dismiss filed by the BA, while these matters were under advisement.

[7] Although Nova argued at the hearing that this district often allows oral modification at the confirmation hearing – which is true as long as due process rights are preserved – Nova did not actually propose a modification at the confirmation hearing. Instead, it suggested that this court could simply enter a confirmation order with the terms the court deemed necessary to confirm the plan. That is not within the court's powers, and would, instead, require the court to place its finger on the scale in favor of Nova rather than weigh the evidence before it and reach legal conclusions based on that evidence.

> ***
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) –
>
> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d)(3). Here, Nova did not commence monthly payments to USC, and the issue before the court is whether the automatic stay must be terminated because the court has concluded, after a hearing on confirmation, that the timely-filed plan could not be confirmed.

Several judges within this district have considered this issue, with Judges Leonard and Doub concluding that the court has no discretion but to terminate the stay where confirmation is denied at the confirmation hearing. *See In re Highway 751 Partners, LLC*, No. 09-06564-8-JRL, 2010 WL 702266, *2 (Bankr. E.D.N.C. Feb. 22, 2010); *In re Carolina Commons Dev. Grp., LP*, No. 09-11230-8-JRL, 2010 WL 1965895, *2 (Bankr. E.D.N.C. May 17, 2010); *In re N. Outer Banks Assocs.,* No. 10-01292-8-RDD, 2010 WL 4643721, *3 (Bankr. E.D.N.C. Nov. 8, 2010). Judge Humrickhouse, on the other hand, noted that the statute does not require termination of the stay, but instead provides the court with discretion to modify, annul, condition, or terminate the stay. *In re Croatan Surf Club, LLC*, No. 11-00194-8-SWH, 2012 WL 112980, *2 (Bankr. E.D.N.C. Jan. 12, 2012).

However, the options before the court appear to depend on the stage of the case at which the court is considering stay relief: courts considering a motion for relief from the automatic stay under § 362(d)(3) in advance of the confirmation hearing note that when adjudicating a motion for

relief from stay pursuant to that statute, the court need not conduct a "mini confirmation hearing." *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D.W. Va. 2008). The "reasonable possibility" of confirmation inquiry "is a lesser showing than that required at confirmation." *Id.*

> In proving a "reasonable possibility" of plan confirmation, *the stage of the proceeding assists in the showing a debtor must make*: "At a minimum the debtor must show that (1) it is proceeding to propose a plan of reorganization, (2) the proposed or contemplated plan has a realistic chance of being confirmed and (3) the proposed or contemplated plan is not patently unconfirmable."

*Id.* (emphasis added) (quoting *In re National/Northway Ltd. P'ship,* 279 B.R. 17, 24 (Bankr. D. Mass. 2002). This minimum showing "require[s] a far lower standard of proof than what will be required of the Debtor to prevail at the final hearing pursuant to § 362(d)(3), *with an even higher standard required should the Debtor make it to the confirmation hearing*." *In re Hope Plantation Grp., LLC*, 393 B.R. 98, 104 (Bankr. D.S.C. 2007) (emphasis added). Courts consider the varying burden of proof to be a "sliding scale." *See e.g.*, *In re Cadwell's Corners P'ship*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) ("There is a sliding scale as to the extent a debtor must prove the possibility of an effective reorganization in a lift stay proceeding depending on the stage of the case.").

As the bankruptcy court for the Southern District of Ohio explained:

> [I]n the initial stages of a Chapter 11 proceeding, the debtor should be granted significant leeway in attempting to establish that successful reorganization is a reasonable possibility. However, as the case progresses, so too does the debtor's burden of proving that successful reorganization may be reasonably expected. Even at the later stages, a motion for relief from stay should not be turned into a confirmation hearing; that is not the debtor's burden of proof. Rather, the test should be viewed as a continuum with the scales tipping in favor of the debtor in the early stages and the burden of proof becoming greater in the later stages. In other words, each case is different and must be viewed on its own with the facts of each case being fully considered.

*In re Ashgrove Apartments of DeKalb Cnty., Ltd.*, 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990).

The logical extension of these cases is that when the court is considering stay relief contemporaneously with confirmation, the debtor bears the full burden of proof to establish that its plan is confirmable, not that it will be confirmed at some time in the future. Similarly, although § 362(d)(3) is mandatory, s*ee Highway 751 Partners*, 2010 WL 702266, at *2; *Carolina Commons* 2010 WL 1965895, at *2; *N. Outer Banks*, 2010 WL 4643721 at *3, Judge Humrickhouse opined that "the exact nature of the relief from stay (i.e., whether the stay is terminated, annulled, modified, or conditioned, all of which are listed as examples within the statute) lies within the discretion of the court." *See Croatan Surf Club*, 2012 WL 112980 at *2 (citing *In re Hope Plantation Grp.*, 393 B.R. at 104 (holding that the court "has discretion to fashion appropriate relief and is not necessarily required to terminate the stay outright"); *In re Crown Ohio Invs. LLC*, 2010 WL 935576 *3 (Bankr. E.D.N.Y. 2010) (holding that the court "has discretion to determine whether the debtor complied with Section 362(d)(3) and to determine the extent of the relief sought")). *See also In re Archway Apartments, Ltd.*, 206 B.R. 463, 465 (Bankr. M.D. Tenn. 1997) ("While Congress may have enacted § 362(d)(3) to protect the interests of secured creditors in single asset real estate cases, it did not completely abrogate the bankruptcy court's discretion to tailor the appropriate relief for failure to strictly comply with the requirements of § 362(d)(3). The language of the statute unambiguously states that the court "*shall grant relief* from the stay provided under subsection (a) of this section, such as *by terminating, annulling, modifying, or conditioning such stay*.") (emphasis in original).

The court appreciates the analysis of courts before it, and reads those cases to suggest that the court should exercise its discretion to take some action short of terminating the stay early in the case, where the debtor's burden of proof is less exacting. However, this court also reads the cases and the statute to require termination at this stage of the case; conditioning the stay on

confirmation of an amended plan within a newly-established timeframe would be in direct conflict with the statutory mandate. This interpretation is supported by case law applying the statute shortly after its adoption, as noted by treatises collecting cases. *See* 3 *Collier on Bankruptcy*, ¶ 362.07[5][b] (16th ed. 2009) ("Although technically the court may condition or modify the stay rather than terminate it, it appears that the legislative intention was to terminate the stay when the debtor neither proposes a viable plan nor makes payments to the secured party. ***A court should refuse to terminate the stay only when there is a strong reason for offering lesser relief***.") (emphasis added) (citing *Nationsbank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 326 (Bankr. E.D. Va. 1996) ("In enacting [362(d)(3)], Congress was apparently concerned about the delay in the bankruptcy process and the resulting unfairness to secured lenders when single asset real estate projects were involved.")).

In *LDN*, the debtor filed its plan after the 90-day period expired, and court found that the new statute was adopted to address the situation before it where the secured creditor was "hopelessly undersecured" and a miracle was needed for the debtor to formulate an acceptable plan. Those are not the facts before this court, but this case was filed over one year ago, and the debtor is proposing a further delay of eight months before any payment is due to USC. Notwithstanding the precise facts before each court, *LDN* stands for the proposition that the court must strictly construe the statute or risk defeating its original purpose.

Here, Nova's plan is not confirmable. Under the circumstances presented here, the court also finds that modification of the automatic stay by anything other than termination, such as conditioning the continuation of the stay on Nova's filling an amended, confirmable plan within a specified time, contravenes the express language of the statute and its purpose as described by courts dating back to the enactment of § 362(d)(3). Accordingly, the motion for relief from the

automatic stay pursuant to the SARE provisions of § 362(d)(3) is allowed and the stay is terminated effective 14 days from the date of this order.

## IV. MOTION TO DISMISS FOR LACK OF INSURANCE

USC's motion to dismiss was based on what USC contends is the inadequacy of Nova's recently disclosed insurance coverage of its real property and improvements thereto, all of which constitute USC's collateral. Based on the evidence presented at the hearings, the court finds that Nova's property is more than adequately insured and the motion to dismiss on this basis is denied.

## V. DIP FINANCING

The court allowed Nova's DIP Motion on an interim basis in January 2026, approving an initial advance of $1.1 million under the terms set forth in the motion and order, D.E. 65, and based on a stipulated value for purposes of that hearing only of $21,800,000. As noted above, Nova's request for a second advance was not heard by the court until the combined hearing on plan confirmation and stay relief.[8] The problems with this timing are numerous, including that the failure to complete construction and thereby obtain a commitment for exit financing were among the bases upon which the court found it could not confirm the plan, but also a more fundamental issue that Nova would cease to be a debtor-in-possession upon confirmation of the plan, rendering DIP financing something *other than* DIP financing. Perhaps Nova could have proposed a delay in vesting or other means that would reconcile the two concepts of plan confirmation and DIP financing, but it did not. However, this is not the actual problem facing the court, because the court has denied confirmation.

---

[8] Mr. Ng'hwani testified that the reason Nova did not seek its second draw earlier in the case was the opposition of USC, but the court could have allowed the financing over the objection of USC (as it did for the first advance) had the issue been brought before the court and had Nova met its burden. As with stay relief under § 362(d)(3), hearing all of the matters simultaneously with confirmation tied the court's hands on matters over which it might have had more discretion earlier in the case.

Instead, the issue is whether the court could allow a further priming lien in favor of SRS based on the valuation conclusion reached by the court and given the court's determination that it has no discretion other than to terminate the stay in favor of USC. The court has concluded that the "as is" value of the property is $18,058,400, and the "as stabilized" value is $21,887,400. Nova requested the court to authorize a priming lien in favor of SRS in the amount of $4,100,000. USC's claim as of the petition date was $10,526,310.53, accruing interest at the per diem rate under the contract of $3,325.60 for 346 days from the petition date through the second day of the confirmation hearing, for a total of $1,150,659.30.[9] UGro's claim as of the petition date was $3,398,470.26, plus interest at the contract rate of 14% compounding monthly. Although there may be some equity to support a priming lien above USC, it is far less apparent that UGro would be adequately protected if its lien is further eroded by SRS. Similarly, the court could not approve an additional advance secured by a priming lien in the face of a potential immediate foreclosure by USC as a result of the termination of the automatic stay.

Nevertheless, the court also notes its findings related to the other factors supporting the DIP Motion in the interest of complete analysis of the record. Christian Daniels of Clearpoint Advisory, LLC, who had been employed as an independent construction professional, testified about the status of construction and anticipated costs to complete. He testified that he has inspected the property two times each month since he was employed, totaling 10-12 visits. Mr. Daniels confirmed that Building 3, which is the building nearest to completion, was 95% complete as of the date of his testimony, awaiting only final inspection of the sprinkler system, cleaning, and punch list items. He testified that Building 2 was 85-90% complete, with only some sheetrock

---

[9] USC contends that it is entitled to default interest postpetition. The court is not deciding that issue, but is calculating the current value of the claim under the contractual interest rate because under either scenario, the value of the property does not support a priming lien. If the court were to allow postpetition default interest, the accrued interest would be double that amount.

repair, final inspections, and cosmetic punch list items. Building 1, on the other hand, had significant damage due to theft that would have to be repaired, with a substantial amount of construction remaining as well. Because work can be performed on all three buildings simultaneously, he estimated three months for completion of the entire project, not including final inspections.

Mr. Daniels also testified in support of Nova's estimated cost to complete, including the request for a second draw of $1,200,000. *See* Nova Ex. 6C. It was Mr. Daniels's expectation that at most another $600,000 would be required as a third draw, for a total cost under the DIP financing of $2.9 million, not including any change orders. Mr. Daniels also testified that if a new contractor or subcontractors were required to complete the job, that substitution would create significant delays of 6-52 weeks and would likely increase the costs due to materials mark-ups.

As noted above, when the court first considered the DIP Motion, USC made a competing proposal for DIP financing that was initially dependent upon the employment of an independent general contractor to complete construction, with no employment of insiders or affiliated entities of Nova for any services. Mr. Weissman testified that this was because there is a high risk of funds being diverted from the project where insiders act as the general contractor or subcontractors. Mr. Daniels testified that he saw no evidence that Nova had used the DIP funds for anything other than the intended, budgeted construction costs.

According to USC, it later withdrew the "no-insider" requirement of its counter-proposal to offer DIP financing. However, as noted by the court in its interim DIP order, there is no requirement that a debtor accept DIP financing from its existing secured lender, and the court found that Nova established, at that time, that there was no better alternative than the proposed SRS funding. In light of the court's findings here, the court hopes that the parties will find a way

to move forward with completion of the project, but as noted repeatedly herein, the court simply does not have the power to authorize further DIP financing under the circumstances now before the court, and the next steps for this project will largely require the agreement and consent of the parties. Accordingly, the request for a second draw of the DIP financing is denied.

**CONCLUSION**

This case has, from its inception, involved delay, obfuscation, lack of communication, and untenable tactics by both parties. Nova failed to designate the case as a SARE case from the beginning and opposed USC's motion to determine the case was an SARE case without any real basis to do so. USC began the case contending that it was in everyone's interest for Nova to complete construction, yet every action it has taken has been to obstruct Nova's efforts to obtain financing and move forward with construction, including seeking reconsideration of the DIP order on a basis that was not pursued at the hearing. Both parties have created delays that are contrary to the Bankruptcy Code's goals of efficiency for a SARE case. USC obstructed Nova's ability to present its case and proceed more timely with DIP financing and confirmation in May, when it withdrew authorization for Nova to use an appraisal obtained by UGro, the second lienholder. USC asserted that the third-party construction consultant failed to provide it with information including as late as the morning of the first confirmation hearing date. Both party representatives took every opportunity during their testimony to attribute bad acts and improper motives to the other, demonstrating that the relationship had deteriorated beyond repair.

Further, although USC argues that value of the property is insufficient to secure its position, USC's tactics are those that are frequently employed by a creditor that wants the property for itself – suggesting that USC recognizes substantial value to the property and its future income generation. On the other hand, Mr. Weissman testified at the confirmation hearing that USC

remained willing to fund completion of the project, signaling that notwithstanding its mixed messaging in this case, USC likely holds a different intent. Nova is not required to accept USC as its DIP lender, but USC's continued willingness to fund persuasively contradicts the inference in this case that USC is interested only in recovering the property for itself.

Although the court has determined that the plan as proposed is not confirmable and concludes as a matter of law that it is required to terminate the automatic stay, it is not apparent to the court that this is the equitable outcome in this case. The court remains convinced that the parties' positions on the first day – that everyone benefits if Nova completes the project – were the correct ones, but the court does not have the authority to force that result under the law applicable in this case.[10]

Based on the foregoing, confirmation of Nova's chapter 11 plan is DENIED; the motion for relief from the automatic stay is ALLOWED and the automatic stay is TERMINATED pursuant to 11 U.S.C. § 362(d)(3), effective 14 days from the date of this order; the motion to dismiss is DENIED; and the request for additional funding pursuant to the DIP Motion is DENIED.

Finally, because of the current disruption of the Bankruptcy Noticing Center that serves orders issued by the court, counsel for Nova is directed to serve this order on all parties not receiving notice through CM/ECF and to file a certificate of service reflecting compliance within 14 days of the date of this order.

**END OF DOCUMENT**

---

[10] Perhaps a lender such as SRS will be willing to fund a refinance of the USC and UGro debt and fund the completion of construction, although the court recognizes that funding would be neither a traditional construction loan nor traditional DIP loan, and perhaps USC would be satisfied if its debt were to be paid sooner through that type of arrangement, but as noted above, that would have to be worked out between the parties. With the consent of USC, the court could approve something akin to that arrangement through the chapter 11 process, but it cannot do so without all parties' agreement given the current posture of the case.